# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-1521

_____

| | | |
|---|---|---|
| Luigino's, Inc., a Minnesota corporation, | * * * | |
| Plaintiff/Appellant, | * * | Appeal from the United States District Court for the |
| v. | * * | District of Minnesota. |
| Robert Peterson, individually; IBP, Inc., a Delaware corporation, | * * * | |
| Defendants/Appellees, | * | |

_____

Submitted:   November 6, 2002

Filed:   January 30, 2003

_____

Before WOLLMAN, LAY, and LOKEN, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Luigino's, Inc. appeals the district court's[1] grant of summary judgment to Robert Peterson and IBP, Inc. on Luigino's claims of breach of fiduciary duty, negligent misrepresentation, corporate usurpation, misappropriation of trade secrets, and breach of confidentiality agreement.  We affirm.

_____

[1]The Honorable Donovan W. Frank, United States District Judge for the District of Minnesota.

# I.

Luigino's is a Minnesota corporation engaged in the manufacture and sale of frozen food entrees under the brand names Yu Sing and Michelina's. At all times relevant to this litigation, IBP was a publicly held company headquartered in South Dakota with approximately $13 billion in annual sales and 56 direct or indirect subsidiaries. In May 1997, IBP acquired Specialty Brands, Inc. (SBI), a manufacturer of frozen Mexican foods, when it acquired SBI's parent company, Foodbrands America, Inc. (Foodbrands). For more than two years prior to its acquisition by IBP, SBI sold frozen Mexican food through convenience stores, warehouse clubs, and grocery stores under four different brand names: Butcher Boy, Posada, Little Juan, and Marquez. Patrick O'Ray, the president of SBI, began the process of consolidating these brands shortly after he became president of SBI in 1995. O'Ray presented this idea to the Foodbrands directors in September 1996, and by early 1998 had hired several people to assist with the launch of the new brand.

In 1997, Jeno Paulucci, founder and Chairman of the Board of Luigino's, contemplated selling Luigino's. On February 13, 1998, IBP and Luigino's entered into a confidentiality agreement so that IBP could examine Luigino's and decide whether to purchase the company. Paulucci rejected IBP's highest offer during the summer of 1998. In September 1998, SBI's Director of Marketing, Robert Berry, began the market research that would lead to the launch of the consolidated José Olé brand. Through copies of IBP's 1997 Annual Report and by sampling SBI's frozen Mexican foods, Paulucci and other Luigino's employees knew of IBP's offerings in the frozen food market. In a December 23, 1998, letter, Paulucci invited Peterson to sit on the Luigino's Board of Directors, suggesting he could "keep an eagle eye on this business." Peterson agreed to sit on the board and completed a questionnaire at Luigino's request for purposes of Luigino's January 1999 bond offering. In response to one question, Peterson stated that he sat on the board of IBP, that IBP and its subsidiaries manufacture food products, and that none of IBP's products directly

competed with Luigino's products. Peterson attended Luigino's board meetings on April 13, 1999, July 13, 1999, and November 9, 1999. Several Luigino's employees and directors who knew of IBP's ownership of SBI and of SBI's frozen Mexican food business also attended these meetings.

On February 18, 2000, SBI submitted a capital expenditure request to Peterson and the IBP board of directors. Peterson attended no Luigino's board meetings after he received this request. SBI's launch of José Olé was announced in April and the products began appearing in stores in June 2000. By this time, the Luigino's Howlin' Coyote line had been in several markets for several months. The José Olé line included 26 items, 21 of which were products that SBI had previously offered under another brand name. The five new items were twelve-ounce items sold in bowls. SBI conducted market tests on the bowl products beginning in February 1999. In June 2000, Stouffer's launched a line of frozen Mexican food products under its Ortega brand. Anticipating great difficulty competing with two extensively marketed lines, Luigino's suspended work on the Howlin' Coyote line on June 14, 2000.

II.

We review the district court's grant of summary judgment de novo, viewing the evidence in a light most favorable to the nonmoving party. Toghiyany v. Amerigas Propane, Inc., 309 F.3d 1088, 1091 (8th Cir. 2002). "Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Viking Supply v. National Cart Co., 310 F.3d 1092, 1095 (8th Cir. 2002).

The district court held that Luigino's failed to assert facts sufficient to support a finding of a causal link between any of the defendants' alleged improprieties and Luigino's alleged damages. Luigino's bears the burden of demonstrating causation on each claim. Nguyen v. Control Data Corp., 401 N.W.2d 101, 105-06 (Minn. Ct.

App. 1987) (affirming judgment as a matter of law on negligence, misrepresentation, contract, and fiduciary obligation claims for lack of evidence of causation). "A mere possibility of causation is not enough." Id. at 105; see also Klimstra v. Granstrom, 95 F.3d 686, 692-93 (8th Cir. 1996) (finding lack of causation on both contract and negligence claims and citing Nguyen). We agree with the district court that each claim fails for lack of causation because Luigino's failed to present evidence sufficient to support an inference that IBP used Luigino's confidential information to its advantage or to Luigino's detriment.

As a preliminary matter, Luigino's alleged that IBP obtained Luigino's confidential information, either through Peterson's attendance at board meetings or during IBP's failed negotiations to purchase Luigino's. This information included: (1) Luigino's research and development information, (2) Luigino's financial information, (3) income statements and documents reflecting volume and sales margins, (4) details pertaining to the launch of Howlin' Coyote, (5) Luigino's top ten customers by volume, (6) the Offering Circular, (7) a second Offering Circular pertaining to snack items, and (8) EBITDA (Earnings Before Interest, Taxes, Depreciation and Amortization) projections for Luigino's through 2004. We agree with the district court that the first three items are merely general categories of information, insufficiently specific to qualify as trade secrets. See Electro-Craft Corp. v. Controlled Motion, Inc., 332 N.W.2d 890, 897-99 (Minn. 1983). Although these general categories of information are not actionable under Luigino's misappropriation claim, we consider this confidential information under Luigino's breach of contract and breach of fiduciary duty claims.

In support of its causation argument, IBP relies principally on the timing of IBP's launch of José Olé and the similarity between some of the José Olé food items and those offered by Luigino's under the Howlin' Coyote brand. Luigino's directs us to the following record evidence: (1) prior to IBP's introduction of José Olé in 2000, no IBP or SBI products had been sold in the frozen entree section of grocery

-4-

stores; (2) prior to the launch of José Olé, SBI's products were low-end handheld products, only a small number of which were sold in grocery stores; (3) in 1998 IBP was exposed to confidential information about Luigino's Michelina's and Yu Sing lines of frozen entrees; (4) in July 1999 Peterson was exposed to trade secret information at a Luigino's board meeting regarding the development of Luigino's Howlin' Coyote brand of Mexican/Southwestern frozen entrees; (5) in October 1999, SBI submitted to the IBP board a Request For Appropriation to "[d]evelop and launch a new frozen Mexican food brand into the Retail and Warehouse Club Channels"; (6) one reason IBP declined to purchase Luigino's in 1998 was its view that Michelina's was not in a growth category; (7) José Olé and Howlin' Coyote included similar products; (8) Luigino's frozen food industry expert's testimony that, based on the similarities between the two product lines, IBP probably used manufacturing, retail trade and consumer information to develop the José Olé line.

Luigino's has thus identified several categories of confidential information and evidence that Luigino's was exposed to the information. Except for citing similarities between the two product lines, however, Luigino's failed to allege how such information was used in the launch of José Olé and did not point out any circumstantial evidence supporting such an inference. Luigino's industry expert asserted a theory that IBP's knowledge that Luigino's thought it was possible to succeed in the frozen Mexican food market gave IBP confidence that it could be done, resulting in IBP's decision to enter the market. Luigino's does not seem to place much reliance on this theory on appeal, however, and in any case the theory does not provide a causal connection between IBP's possession of confidential information and harm to Luigino's. Rather, it merely establishes a temporal relationship between IBP's knowledge that Luigino's thought it could succeed in the frozen Mexican entree market and IBP's overcoming its own concerns about whether to risk entering that market.

We are left with the similarities between the Howlin' Coyote and José Olé product lines, which Luigino's claims are so striking that under no stretch of the imagination could they be the result of coincidence. IBP's José Olé line includes a "Chicken Fajita Bowl" product, a twelve-ounce meal containing grilled chicken breast with bell peppers and onions over seasoned rice and beans, all in a microwaveable bowl. The Howlin' Coyote line includes a "Grilled Fajita-Style Chicken" product, an eleven-ounce meal described as "zesty fajita sauce and chicken breast (with rib meat), vegetables and seasoned rice." The José Olé line also contains a "Beef Steak Fajita Bowl" and a "Chicken & Salsa Bowl," which Luigino's compares to its "Skillet Fajita-Style Beef" and "Grilled Chicken with Fire-Roasted Tomatoes" products. That José Olé contains chicken and beef fajita and chicken with salsa products superficially similar to Howlin' Coyote products is unremarkable. Neither fajita products nor bowl products were innovations introduced to the frozen food market by the product lines at issue in this case. IBP began market testing the bowl products in February 1999, before Peterson had attended any Luigino's board meetings. Even when viewed in a light most favorable to Luigino's, the product similarities do not support an inference that IBP used Luigino's confidential information to develop products for the José Olé line. Luigino's directs us to no evidence that IBP used any of the cited confidential information, such as the list of Luigino's top ten customers, its financial information, its documents reflecting volume and sales margins, or its research and development information. The superficial similarity between some of the competing products is insufficient to support an inference that José Olé contains those products because IBP was exposed to confidential Luigino's information.

To the contrary, the evidence in the record all points to independent development of the José Olé line by IBP's indirect subsidiary SBI. SBI's president began a program to consolidate its splintered brands in the frozen Mexican food market in 1995. The idea was presented to Foodbrands, SBI's parent company and IBP's direct subsidiary, in September 1996. By early 1998, SBI had hired an

experienced group of employees to implement the plan to develop a consolidated umbrella brand. This team included Neil Ritchey, who had previously worked for Kraft foods, Rick Bauman, who had previously worked for Nestle and had experience in the Stouffer's retail frozen food line, and Robert Berry, who had previously worked for ConAgra and had experience in marketing consumer food brands and retail items. In January 1999, SBI added Mitch Huff, who had experience in the retail food industry and who was responsible for building a team of brokers to launch the new brand. The experience SBI necessarily gained by hiring these individuals underscores Luigino's failure to present any evidence that confidential information obtained by IBP influenced SBI's development or launch of the José Olé brand.

Luigino's also argues that Peterson breached his fiduciary duty to Luigino's by failing to disclose the existence of IBP's José Olé project immediately after he learned of it at IBP's February 2000 board meeting. In January 2000, a month before Peterson learned of José Olé, Luigino's decided not to push Howlin' Coyote beyond the markets into which it had already been introduced, citing to the costs involved in expansion. Luigino's asserts that if Peterson had disclosed that one of IBP's subsidiaries was gearing up to launch a premium Mexican food line, it would have accelerated investment in Howlin' Coyote to secure its first mover advantage. This is far too slender a reed upon which to support a causal link between Peterson's presence on Luigino's board and competitive harm to the Howlin' Coyote line. See Medtronic, Inc. v. Convacare, Inc., 17 F.3d 252, 255-56 (8th Cir. 1994) (affirming judgment as a matter of law on breach of fiduciary duty claim). Even if Peterson's fiduciary duty to Luigino's would ordinarily have required him to disclose knowledge of the imminent launch of a competitive product, in light of the undisputed evidence that Luigino's had extensive knowledge of IBP's food businesses when it hired him, Peterson's duty to disclose confidential IBP information to Luigino's was necessarily limited. The record discloses two reasons for Paulucci's inviting Peterson to sit on Luigino's board: (1) Luigino's needed outside experts on its board to secure the $100 million in bonds it was seeking, and (2) Paulucci had not given up on selling the

company to IBP. In <u>Medtronic</u>, we held that even with "an obvious conflict of interest," the plaintiff's failure to show that the defendant had used its position to gain inside information or other unfair advantage was fatal to its breach of fiduciary duty claim. <u>Id.</u> at 256. As in <u>Medtronic</u>, the harm alleged here is competitive in nature. Luigino's failed to establish a fact issue as to whether Peterson improperly conveyed confidential information that was used to assist the launch of José Olé. Thus, Luigino's breach of fiduciary duty claim premised on the harm to Luigino's from open competition by José Olé (and Ortega) was properly dismissed.

Because Luigino's failure to establish a genuine issue of material fact regarding causation defeats all of its claims, we need not address its other arguments raised on appeal.

In light of the basis upon which we affirm the district court, we deny the defendants' motion to strike portions of Luigino's revised reply brief and appendix.

The judgment of the district court is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-8-